

a professional corporation

Madden Building
150 West Jefferson Avenue, Suite 100
Detroit, Michigan 48226
T: 313 225 7000  F: 313 225 7080
butzel.com

June 23, 2016

VIA HAND DELIVERY

Hon. Victoria A. Roberts
United States District Judge
Eastern District of Michigan
211 West Lafayette Boulevard, Room 211
Detroit, Michigan 48226



SENTENCING DATE:
JULY 7, 2016 at 11:30 A.M.

    Re:   *United States v. Nallani*, Crim. No. 11-20365
           Defendant's Sentencing Memorandum

Dear Judge Roberts:

    Please allow this letter to serve as a sentencing memorandum on behalf of our client, Dr. Surya Nallani. Given the exceptionally personal information contained in this letter, we have not cast it as a formal pleading for filing with the Clerk's office. We have, of course, provided copies to AUSA Philip A. Ross and Probation Officer William D. Hampstead.

    The procedural facts of the case are set forth in the Probation Department's presentence report, so we will not repeat them in detail here. On August 28, 2015, the Government filed a one-count Information charging Dr. Nallani with money laundering. She withdrew $162,000 from a bank account to cover her employees' payroll and to pay a retainer for counsel, while being willfully blind that the funds in the account were tainted by her husband's improper Medicare billing practices. On January 7, 2016, Dr. Nallani pleaded guilty under a Rule 11 agreement.

    No exposition on the law governing sentencing is necessary. It is sufficient to note that the Court must give respectful consideration to the Guidelines, while ultimately imposing a sentence that is sufficient, but not greater than necessary, in light of the § 3553(a) factors. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). To that end, this letter begins, where the Court must, with the Guidelines. It then analyzes the statutory factors and goals that the Court must weigh in crafting an appropriate sentence.

Hon. Victoria A. Roberts
June 23, 2016

## SENTENCING FACTORS

### 1. The Guidelines

The Rule 11 provides that the guidelines range is 21-27 months, unless the Court lowers the guidelines range through downward departures under U.S.S.G. § 5K2.0. (R. 149, Rule 11 at ¶¶ 2(B)-3(A), PageID# 1520-21.) The sentence cannot exceed the top of the guidelines range after being adjusted to account for any downward departures. (*Id.*)

Contemporaneous with this Memorandum, Dr. Nallani has filed a Motion for Downward Departure, seeking a 5-level reduction for "diminished capacity," a 3-level reduction for "aberrant behavior," and a 3-level reduction for "family ties and responsibilities." Granting all three, or granting one 5-level and one 3-level reduction, would reduce the guidelines to a Zone A range of 0-6 months. Two 3-level reductions would reduce the guidelines to a Zone B range of 6-12 months. Any single 3-level reduction would result in a Zone C range of 12-18 months. A sentence could not exceed the top of a reduced guidelines range established by the Court. (*Id.*)

### 2. Sentencing Commission Policy Statements

The following Policy Statements are relevant: U.S.S.G. §§ 5H1.3 (mental and emotional condition), 5H1.6 (family ties and responsibilities), 5K2.13 (diminished capacity), 5K2.20 (aberrant behavior). Each forms the basis for the downward-departure arguments raised in the Motion for Downward Departure.

### 3. Restitution

Restitution is not required. (R. 149, Rule 11 at ¶ 3(E), PageID# 1522.)

### 4. Available Sentences

Under the Rule 11, the Court may not impose a fine because the parties' forfeiture agreement satisfies all of the financial requirements for the disposition of this case. (*Id.* at ¶ 3(D), PageID# 1521.) Otherwise, all sentencing options are available to the Court, including probation and home confinement.

### 5. Avoiding Unwarranted Sentencing Disparities

In light of the special circumstances of this offense and Dr. Nallani's personal history described in the Motion for Downward Departure and Section 6, *infra*, counsel respectfully submits that a non-custodial sentence would not result in "unwarranted" sentencing disparities.

BUTZEL LONG

Hon. Victoria A. Roberts
June 23, 2016

### 6. History of the Offender and the Offense

Dr. Nallani's personal history is detailed in the Motion for Downward Departure and in her letter to the Court. (Exhibit 1, Surya Nallani Ltr.) Rather than repeat that information in detail here, we wish to draw special attention to a few items: (1) Mr. Nallani's suicide note, addressed directly to the Court; (2) Mr. Nallani's handwritten letters to Dr. Nallani and other family members; and (3) letters offered in support of Dr. Nallani. At the core of this case is Dr. Nallani's failure to question her husband's billing practices or to otherwise exercise sufficient oversight of his activities. These three items provide clearer insight into why Dr. Nallani was unable to do so.

#### A. Suicide Note

Mr. Nallani's suicide note is important in two respects.

First, his dying declaration was to proclaim that Dr. Nallani was innocent, in the sense that she did not have any involvement in his billing errors. On the third page, he explained that he was disliked and unsuccessful for most of his life, and he "wanted [his] cousins/family to see [him] as an educated, successful person, so [he] did billing, office management, telephone, . . . hiring, verifications, training, [and created] the EMR [electronic medical record software] application." (Exhibit 2, Suicide Note at 3.)

Second, the suicide note showcases the kind of mental state and anger that Dr. Nallani dealt with on a regular basis. The first two pages of the suicide note are a rant against not only the Government, but also his attorneys and us. Mr. Nallani describes a cabal of "mad dogs" conspiring to incarcerate Dr. Nallani. The note plainly reflects a person suffering from severe mental illness manifesting as paranoia.

#### B. Handwritten Letters

Mr. Nallani's handwritten letters are important because they reflect the domination that he exercised over his wife.

His first letter describes his "dream wife" as one who "never argues, fights, gets emotional [or] does anything against my wishes." He complains that Dr. Nallani does not "like to listen to [him] and does "everything just [the] opposite [of his] wishes" and that she spends too much time talking and spending time with her friends—1-2 p.m. was too late in the day for her to "enjoy [her] time with friends." (Exhibit 3, First Letter at 2-3.)

A second letter dictated how she could dress, demanded that she "come home by 7 p.m. at the maximum straight after work—no questions," and after recounting how his brother's wife left him for another man, he told her what he would do to her if he caught

BUTZEL LONG

Hon. Victoria A. Roberts
June 23, 2016

her cheating: she "cannot get anyone better than [him]," "but if [he got] upset, it [would] be very bad for [her]." (Exhibit 4, Second Letter at 1-3.)

Mr. Nallani's demands intensified in a third letter, which begins, "[n]ow read carefully and change," before telling Dr. Nallani that she must learn to cook, not have any friends, not wear makeup, not eat certain foods, and have "no desires [because] a good wife will have no desires." (Exhibit 5, Third Letter at 1-2.) Mr. Nallani also made it clear to Dr. Nallani that her "husband and home are first," and there were to be "no discussions, no unnecessary questions"—she was to "study 10 hours a day [and] keep [the] house clean and disciplined." (*Id.* at 4.) As Dr. Nallani explained in her civil deposition, she was expected to take care of all of the housework, despite putting in 14-hour days, because that was "not his job" as a husband. (Exhibit 6, Surya Nallani Depo., 80:5-24 (Mar. 31, 2015).) Even on family vacations, she was required to cook for him; "he would rather starve" than eat out. (*Id.* at 130:20-131:8.)

Mr. Nallani's letters are to show that he tried to control her behavior at work. He told her that she smiles too much. (Exhibit 5 at 4.) He had seen her smiling and talking to a male colleague, so he warned her not to talk to men and told her that she "knew what [could] happen (remember the SLAP)." (*Id.* at 2, 4 (emphasis in original).) He cautioned her that a "smart wife do[es] not repeat mistakes." (*Id.* at 3.) In cold, martial fashion, Mr. Nallani ended his four-page edict with: "That is all." (*Id.*)

He enforced his edicts through physical force. Slaps escalated to punching, kicking, and burning Dr. Nallani with cigarettes. He was "violent anytime he didn't get his way." (Exhibit 6 at 50:13-25.) On one occasion, Mr. Nallani beat her so hard that she had rib fractures, but she could not seek medical attention because he threatened to kill himself. (*Id.* at 51:1-15; 52:3-5.) On another occasion, *while she was pregnant with their son*, he kicked Dr. Nallani in the abdomen and caused abdominal cramping. (*Id.* at 51:16-52:2.) She thought she was losing ▮▮▮▮ to a miscarriage, but could not seek medical attention because he again threatened suicide. (*See id.* 53:14-19.) Fortunately, a later routine visit to the OBGYN showed no damage to her son. (*Id.* at 52:1-2.) These kinds of beatings continued "the whole time [they] were married." (*Id.* at 53:20-23.)

Understandably, Dr. Nallani became very deferential to her husband to keep peace in their home. "[T]here was only one way, that [was] my husband's way." (Exhibit 6 at 19:3-4.) "[I]f you want a proper atmosphere at home, someone has to give in, right? . . . I don't like confrontation." (*Id.* at 19:12-16.) Dr. Nallani also felt trapped. Mr. Nallani repeatedly threatened to end his life if she ever left him or told anyone about the abuse. (*Id.* at 53:9-19.)

Hon. Victoria A. Roberts
June 23, 2016

### C. Children's Letters

By far, the most notable letters in support of Dr. Nallani are from her children, ███████████, who corroborate the ongoing abuse. Together, they share their perspectives on the dark atmosphere of fear that prevailed at home, pierced only by their mother's kindness and affection between their father's fits of rage.[1]

███████ letter recounts two stories that underscore why Dr. Nallani had no real power to question her husband: Questions provoked anger and violence.

First, ██████ recounts a time when her mother questioned her father about taking her credit card without asking. ██████ remembers that her father "responded by throwing dishes at her [mother] and holding up a kitchen knife to his neck and threatening to leave her if she questioned him. Instead of feeling loved and cared about, my mom felt anxious around my dad because she never knew if the next time he would hold up a kitchen knife to her neck instead of his own." (Exhibit 7, ██████████ Ltr. at 3.)

Second, ██████ remembers another occasion when her father forgot to pick up her brother ████, then only eight years old, from school because he was drunk. When Dr. Nallani and ████ asked Mr. Nallani how he could forget his son for so many hours, "he started screaming and yelling at the top of his lungs that nobody in our family appreciated him, slapped himself with his hands, and eventually turned on my mom and choked her." (Id. at 3.) Mr. Nallani then locked himself in the bathroom, "screamed and cursed" through the door before "burst[ing] out of the bathroom[,] flailing and hitting his head on the dining room chair and the vacuum cleaner." (Id. at 3.)

██████ is proud of her mother for her perseverance in the face of such adversity. Dr. Nallani has inspired her to pursue medicine as her vocation:

> I am in awe of my mom's bravery and dedication to her
> profession and to her family. I genuinely cannot think of
> another human being who has endured what she has and still

---

[1] The Court should take special note of the fact that ██████████████ wrote these letters without input or censorship from their mother. It was important to them that the Court read their letters free from any minimizing their mother may have encouraged out of embarrassment. Dr. Nallani still carries misplaced shame as a victim of domestic violence; she is humiliated at the disclosure of the struggles she and her family have endured. Her letter to the Court reflects that, making oblique references to the serious victimization she endured, such as: "I used to get into trouble by not following rules," "[asking Mr. Nallani questions] would just cause problems," "he would punish me for asking questions," and "I would be punished for the suggestions."

BUTZEL LONG

Hon. Victoria A. Roberts
June 23, 2016

> somehow remained so dedicated to her profession and her family. She has taught ▮ and me to be honest, compassionate, forgiving, hard working, and most importantly resilient. Medicine is so much more than just a job to my mom: it is her life's calling. She has dedicated her entire life to passionately pursue medicine despite the incredible challenges she faced during married life. She did not go into this profession for money or prestige, but rather because medicine is her life's work and her contribution to society. I am so incredibly proud to call her my mother. [She] embodies the mother and physician I want to be in the future. . . . .

(*Id.* at 4.) ▮ wonders "how much more [Dr. Nallani] will need to suffer and how much more trauma she will need to face before she is allowed to return to a life where she can raise her children and work as a physician . . . ." Regrettably, the end is far from near. After being sentenced here, the Michigan Board of Medicine can revoke or suspend her medical license. MCL 333.16221(b)(v); MCL 333.16226(1). The Board will most likely suspend Dr. Nallani's license for at least three years under existing practice. Mr. Nallani's abuse continues to cast a long shadow.

▮ letter recounts similarly scarring experiences with his father. On one occasion, he asked his father why he was smoking, after discovering a packet of cigarettes in the car:

> He got so mad that he started getting violent, and he was yelling. After a few minutes of that, he banged the door and locked me in the garage . . . [He] opened the door after around 20 minutes, and said something I still remember: "That is why you don't ask that question." That was the first thing he said to me when he let me in the house.

(Exhibit 8, ▮ Ltr. at 2.) When ▮ mustered up the courage to ask his father why he was smoking for a second time, "[he] was locked in the bathroom for literally around 40 minutes with [his] dad yelling at [him] through the door; ▮ was sobbing on the floor of the bathroom. After the 40 minutes was over, [Mr. Nallani] suddenly opened the door and acted like nothing was wrong!" (*Id.* at 2.)

Like ▮, ▮ also saw his father attack his mother. On one occasion, when he was seven years old, he saw his father "literally grab[ his] mom by the legs and start[] slapping her and dragging her across the living room." (*Id.* at 2.) On another occasion, he saw his father grab his mom, "abusing and being extremely violent with her. Then, [he] got a knife and started threatening [Dr. Nallani]." (*Id.* at 2.)

Hon. Victoria A. Roberts
June 23, 2016

### D. Other Letters

Other letters in support of Dr. Nallani are also attached. (Exhibit 9.) One is particularly noteworthy. It is from Dr. Veena Kalra, another physician who was getting started in the medical profession at the same time as Dr. Nallani. (Exhibit 10, Veen Kalra Ltr.) Dr. Kalra also had a tough road. A divorced mother of two, she was unable to secure placement in a residency program. She struggled for over a year without an income, surviving on savings. When those savings ran out in August 2003, she called her friend, Dr. Nallani, for support and advice. Dr. Nallani encouraged her to pray, to keep studying, and assured her that things would get better. "A day later, Surya came to my apartment and handed me a check. The check was in the amount of her first paycheck from her first job as a physician in the USA. I was in disbelief and overwhelmed . . . she told me that she didn't want me to be distracted and worry about money, that she could survive on what she had saved until her next check—so that I could pass my exams and continue to feed my children." (*Id.* at 1.) The check was for $3,200.00. (*Id.* at 3.)

This was a remarkable act of selflessness and kindness. And it was one in keeping with her years of service to the poor and underserved through medicine.[2] Dr. Nallani's compassion for Dr. Kalra exemplifies who she is. Years of abuse never hardened the spirit of a woman who has dedicated her life to helping others.

### E. The Offense

It is against this backdrop that the offense must be considered. As one might expect, Mr. Nallani's deficient mental health fueled anger problems, which in turn caused employment problems. Because Mr. Nallani demanded that she be home to cook and clean, because he could not keep a job, and in an effort to limit his disappearances,[3] Dr. Nallani agreed to start her own business—Allied Geriatric Services ("AGS")—so that he "could sit at a desk and call" her while she made house calls to residents in Detroit, Hamtramck, Highland Park, Pontiac, and other underserved areas. (Exhibit 11, Gerald A. Shiener, M.D.'s Report on Interviews of Surya N. Nallani (October 6, 2014) at 2.)

As noted in the Motion for Downward Departure, Dr. Nallani took the time to research how to properly operate a house-call practice. In September 2005, she joined the American Academy of Home Care Medicine, which provided her with booklets

---

[2] Notably, this act of benevolence occurred two full years before the events giving rise to the original Indictment, which were alleged to have started in September 2005.

[3] Mr. Nallani would disappear at all hours of the night. On at least one occasion, his disappearance was so protracted that Dr. Nallani called the police to report him missing. (Exhibit 12, Bloomfield Township Police Rpt. (Jun. 7, 2006).)

BUTZEL LONG

Hon. Victoria A. Roberts
June 23, 2016

outlining how to establish and operate a house-call practice. She organized her practice as outlined, working with another physician and collaborating with nurse practitioners and physicians assistants who also saw patients. Dr. Nallani also hired a professional billing company to handle all Medicare billing. Mr. Nallani was supposed to handle patient scheduling, and nothing more.

As his own suicide note reflects, however, he was not content to work "for" Dr. Nallani; he had to run the business—it had to be "his" business. ▌remembers her father repeatedly referring to it as "his" company. Indeed, virtually every former AGS employee whom we personally interviewed in preparation for trial confirmed that Dr. Nallani handled the medicine, and Mr. Nallani ran the business. The same is true for former employees interviewed by my investigator.[4]

After almost a year into AGS's operations, Mr. Nallani took over the billing process and management of the office, claiming that the professional biller had taught him how to properly bill. (*See* Exhibit 6 at 47:2-6; Exhibit 11 at 2.) Without telling Dr. Nallani, he took over all contact with Medicare. For example, Mr. Nallani forged Dr. Nallani's name to a check, he did not show her correspondence from Medicare indicating that there had been a billing problem, (Exhibit 13, FBI-302 of Interrogation of Srinivas Nallani), and he handled oral inquiries to and from Medicare's auditing company. When interacting with the auditing company, he would represent himself as "Dr. Nallani":

> Dr. Nallani called and wanted to know if *he* could fax me the medical records for the SVRS, I explained to *him* that as this was a large amount of records and becasue [sic] we would use the documentation to conduct our medical review, mailing would ensure that we all documentation to support the received service he biled [sic]. Dr. Nallani indicated that *he* owuld [sic] mail the records.

(Exhibit 14, TSCMS-0644 (emphases added).) (*See also* Exhibit 15, TSCMS-1238 ("Called 248-220-1148, spoke to Dr. Nallani, *he* will pull chart review for DOS 7-20-07, told *him* I would need copy of notes. *He* will call me back.") (emphases added); Exhibit 16, TSCMS-1247 ("called for medical records for G0181 home health care supervision (care plan oversight) dos 7-20-06. The doctor answered the phone, first *he* said looked *he* hadn't seen he since 6-9-06, then maybe family had called in july [sic]. *He* will pull chart, review and call me back if [there are] notes[,] *he* will then get fax number.") (emphases added).)

---

[4] The defense interviewed 39 people in connection with its investigation of this case, several of them multiple times.

BUTZEL LONG

Hon. Victoria A. Roberts
June 23, 2016

Mr. Nallani was clearly in over his head. As outlined in the Rule 11, he improperly billed the Medicare program for services rendered by the practice's nurse practitioners and physicians' assistants as if they were performed by a physician, resulting in a 15% overpayment by the Medicare program for the services rendered by those non-physician providers. (R. 149, Rule 11 at ¶ 1(C), PageID# 1519.)

After being charged in this case, Dr. Nallani transferred $162,000 from a bank account that included funds tainted by the 15% overpayment. (*Id.*) She did so to cover the payroll due to her employees and to pay a $25,000 retainer to her first criminal lawyer, Jim Burdick. As a matter of law, Dr. Nallani was on notice that the bank account included tainted funds. But, practically speaking, she allowed herself to remain willfully blind to the existence of tainted funds out of a fear of confronting her husband after years of suffering abuse at his hands. Consistent with her culture, upbringing, and conditioning through decades of violence, she deferred to her husband's statements that he had billed properly.

## APPLYING THE FACTORS TO CONGRESSIONAL SENTENCING GOALS

Having considered the relevant statutory sentencing factors, the Court must now apply them to craft a sentence that is "sufficient, but not greater than necessary" to meet Congress's sentencing goals. Those goals include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford general and specific deterrence; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

### 1. Specific Deterrence

Incarceration is unnecessary to achieve specific deterrence in this case. Dr. Nallani is a good and decent woman who has lived an otherwise law-abiding life. The offense was driven by willful blindness to the actions of her husband, a blindness conditioned over decades of spousal abuse. Now deceased, Mr. Nallani can no longer abuse or control her.

The last several years since Mr. Nallani's death confirm this. She has worked for Michigan Urgent Care, a company that operates several urgent care clinics in southeast Michigan. The company is owned by Dr. Mohammed Arsiwala, who is a member of the Michigan Board of Medicine. Dr. Arsiwala has written a letter in support of Dr. Nallani, noting that she is "altruistic, dependable, and trustworthy," that she has "a pleasant personality, a great bedside manner and solid clinical skills," and that she is "a great physician with high moral values." (Exhibit 17, Mohammed Arsiwala Ltr.)

Hon. Victoria A. Roberts
June 23, 2016

However the concept of specific deterrence may apply in this case, the restrictions on liberty that attend non-custodial sentences (e.g., probation and home confinement) would be sufficient to achieve it.

2.  **General Deterrence & Promoting Respect for the Law**

Congress's goal of promoting general deterrence goes hand-in-hand with its goals of promoting respect for the law and imposing a just punishment. To accomplish these competing (yet complimentary) goals, punishment must be sufficient to promote deterrence. But it must not be so severe that it is perceived as unjust, lest the goal of promoting respect for the law be sacrificed in the process. Cesare Becarria, *On Crimes and Punishments*, Chap. 2 (1764). The issue then become (or remains): "How severely do you punish Person A to deter Persons B, C, and D from the same or similar contemplated conduct without being perceived as unjust?"

While many believe that higher sentences have greater deterrent effect, the empirical research shows no relationship between sentence length and deterrence. The findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. "Current empirical research on general deterrence shows that while *certainty* of punishment has a deterrence effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence.'" Amy Baron-Evans, *Sentencing by the Statute*, ABA National Institute on White Collar Crime Book I-7 (2011) (internal citation omitted).

Senior Judge John L. Kane, sitting on the United States District Court for District of Colorado, has expressed similar observations from his sentencing practice. "Scant evidence supports the assumption that imprisonment deters criminal behavior. In fact, I doubt that punishment keeps most people from committing crimes. No offender commits a crime unaware that penalties can be imposed . . . Punishment of one does not deter others who are similarly situated. Most law-abiding people have far more powerful behavioral influences such as emotional stability, moral values, work ethics, and education." John L. Kane, *From the Bench – Sentencing: Beyond the Calculus*, ABA LITIGATION, THE JOURNAL OF THE SECTION OF LITIGATION, Vol. 37, No. 1, Fall 2010.

No one in an abusive situation similar to the one Dr. Nallani experienced daily for nearly 20 years would decide to engage in, or refrain from, the kind of everyday banking transfer at issue in this case based on the distinction between a custodial or non-custodial sentence. Their actions would be motivated by the singular desire to avoid immediate physical and emotional abuse. Under such circumstances, a non-custodial sentence is likely to achieve a greater level of general deterrence than a custodial sentence. A custodial sentence could be perceived as too severe and therefore unjust.

Hon. Victoria A. Roberts
June 23, 2016

* * *

  A crime has been committed; justice requires punishment. Yet the offender is a victim, brutalized for 20 years by a man who was himself a victim of mental illness. A family broken by violence, destroyed by suicide, remains in turmoil. Justice also requires pity.

  Punishment and pity, often irreconcilable, can be reconciled through a non-custodial sentence. Probation would achieve punishment by denying Dr. Nallani the "absolute liberty to which every citizen is entitled," *Gall v. United States*, 552 U.S. 38, 48 (2007), yet it would also allow a mother to raise a son who has lost a father, to mentor a gifted daughter aspiring to join her mother as physician, and to rebuild a family rooted in tenderness instead of cruelty. We therefore request that the Court impose a non-custodial sentence, and we respectfully suggest that probation would be the most appropriate sentence in this case.

          Respectfully submitted,

          BUTZEL LONG, P.C.

George B. Donnini            Joseph E. Richotte

Encls.

BH2215882.1

cc (w/encls. via email):

  Dr. Surya N. Nallani, M.D.
  AUSA Philip A. Ross, Esq.
  USPO William D. Hampstead